```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
                 Civil No. 15-4155(DSD/BRT)
```

Bobby J. Woods,

      Plaintiff,

v.                                           **ORDER**

K.R. Komarek, Inc., and
Brady-McCasland, Inc.,

      Defendants.

      Kevin S. Sandstrom, Esq., 1809 Northwestern Avenue, Stillwater, MN 55082, counsel for plaintiff.

      Calvin P. Hoffman, Esq. and Stinson Leonard Street, LLP, 150 South 5th Street, Suite 2300, Minneapolis, MN 55402, counsel for defendant K.R. Komarek, Inc.

      Stephen M. Harris, Esq. and Meyer & Njus, 200 South 6th Street, Suite 1100, Minneapolis, MN 55402, counsel for defendant Brady-McCasland, Inc.

      This matter is before the court upon the motions for summary judgment by defendant K.R. Komarek, Inc. and plaintiff Bobby J. Woods d/b/a Controls Plus. Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants Komarek's motion and grants Woods's motion in part.

**BACKGROUND**

      This commercial dispute arises out of Woods's purchase of industrial equipment from Komarek on behalf of defendant Brady-McCasland, Inc. (BMI). Woods is an engineer who specializes in industrial instrumentation and controls. Woods Dep. at 7:22-9:23.

Woods previously worked at Hosokawa Bepex where he helped BMI design a control system for its facility.[1]  Id. at 10:2-10; 11:8-16.  While working on the BMI project, Woods met BMI's plant manager, Alan Johnson.  Id. at 26:13-27:3.  Woods later formed Controls Plus, a company that provides consulting and design services.  Id. at 15:14-16:13.  In 2000 or 2001, Johnson asked Woods to help him locate a new source of manufacturing equipment.  Id. at 30:1-20.  Woods recommended Komareck, a manufacturer of custom briquetting and compacting equipment.  Id.  From 2003 through 2014, Johnson ordered equipment for BMI from Komarek and other manufacturers through Woods.  Id. at 30:21-32:16.  Johnson would place an order with Woods, who would then order the equipment from Komarek or another manufacturer for delivery to BMI.  Id. at 35:9-37:9.  BMI did not pay the manufacturer directly.  Instead, BMI paid Woods, and Woods paid the manufacturer.  See, e.g., ECF No. 4 Ex. B; Sandstrom Aff. Ex. 6, at 1-2.  Although the equipment was sent directly to BMI, BMI claims that Woods represented that he would store the equipment.

Beginning in 2005 or 2006, Woods started giving Johnson cash incentive payments.  Id. at 139:2-12.  Under this arrangement, Johnson would request a quote from Woods, who would then contact a manufacturer to obtain a price.  Id. at 47:15-48:18.  Woods

---

[1] BMI is a Missouri corporation that manufactures chemicals for the oil and gas industry.  Fox Dep. I at 7:1-12.

2

testified that he would decide how much to charge BMI solely based on the quoted price.  Id.  But he also testified that his prices reflected the value he added to the transaction such as ensuring that the ordered parts met BMI's specification.  Id. at 55:1-20. Johnson, who needed approval for the purchases, told Richard Fox, BMI's owner, that the quoted prices were a "good price, a fair price, and a fair deal for the company."[2]  Fox Dep. II at 16:23-17:2.  Fox routinely approved the orders.  Fox Dep. I at 30:3-4. Woods would then pay Johnson 10 to 20 percent of the profits from each order.  Woods Dep. at 114:1-8.  From 2011 through 2015, Woods paid Johnson over $132,833.  See Harris Aff. Ex. C, ECF No. 27.[3] Fox was not aware of the arrangement between Woods and Johnson. Woods Dep. at 167:10-12.

Three specific orders are at issue in this case.  First, in January 2014, Woods ordered $32,170 worth of equipment from Komarek to be delivered to BMI (First Order).  ECF No. 4 ¶ 6; Id. Ex. A.; ECF No. 12 ¶ 3.  It is undisputed that Woods made an initial payment of $9,291 but failed to pay the balance of $22,879 after

---

[2] From 2010-2014, Johnson was the sole point of contact between BMI and Woods.  Woods Dep. at 46:14-47:47:14; Fox I Dep. at 29:25-30:15.

[3] Although some of the checks to Johnson appear to be for consulting services, Woods does not dispute BMI's characterization that these payments were incentive payments.

Komarek shipped the goods to BMI.[4]  See ECF No. 12 ¶¶ 4-5.

Second, in August 2014, Johnson requested a quote from Woods for industrial equipment (Second Order).  See ECF No. 4 ¶ 10; id. Ex. B; ECF No. 12 ¶ 6.  Woods contacted Komarek who offered the equipment at a price of $278,550 with a thirty percent down-payment, a thirty percent mid-way payment, and the balance due within thirty days after shipment.  See ECF No. 4 Ex. B; Compl. ¶ 11.  Woods quoted BMI a price of $389,970, a forty percent markup, on the same payment terms.  See Sandstrom Aff. Ex. 6, at 1-2.  It is undisputed that BMI accepted the quote and made the initial thirty percent and mid-way payments to Woods but failed to pay the remaining balance of $155,988.  See id. at 3; Fox Dep. I at 24:16-25:16.  The parties also agree that Woods paid Komarek the initial thirty percent payment and the mid-way payment but failed to pay his remaining balance of $111,420.  See ECF No. 4 ¶¶ 12-14; id. Ex. C; ECF No. 12 ¶¶ 7-9.

Third, Johnson placed a separate equipment order with Woods in August 2014 for the quoted price of $75,960 (Cancelled Order). Compl. ¶ 25; BMI Second Am. Ans. ¶ 23; Harris Aff. Ex. F.  BMI paid Woods in full before receiving the equipment with the understanding that Woods would order the equipment and then store it for BMI. Compl. ¶ 25; BMI Am. Ans. ¶ 25; Fox Dep. I 15:17-25; Harris Aff.

---

[4] Woods disputes the exact amount owed.  See ECF No. 12 ¶¶ 4-5.

Ex. F. Sometime after this order, Alan Johnson retired from BMI and was replaced by Chris Pierce.[5]

On June 3, 2015, Pierce contacted Komarek about the Cancelled Order and discovered that Woods had never placed an order for the equipment. See Harris Aff. Exs D, E. BMI also learned that Woods did not actually store the equipment despite his representations to the contrary. See Harris Aff. Ex. F; Fox Dep. I at 13:18-14:9. In his conversations with Komarek, Pierce also learned that BMI could buy equipment directly from Komarek at a cheaper price.[6] Fox. Dep. I at 10:8-12:8; Kelly Decl. Ex. 7 at 6-7. On the same day, BMI canceled its order with Woods, and it also advised him that it would no longer place orders with him because he charged a significantly higher price and misrepresented his involvement in ordering and storing equipment for BMI.[7] Fox Dep. I at Fox Dep. I at 10:8-19, 12:16-13:22; Woods Dep. at 62:5-11. Woods did not refund any part of the $75,960 to BMI. Woods Dep. at 160:20-161:3.

On October 21, 2015, Woods filed suit in state court asserting claims of breach of contract, unjust enrichment, account stated, and wrongful repudiation of contract against BMI and declaratory

---

[5] The record is unclear as to the exact date Johnson retired and how soon thereafter Pierce replaced him.

[6] Although Woods testified that he placed the order with Komarek, there is no corroborating evidence in the record. See Woods Dep. at 148:6-152:15.

[7] It is unclear when BMI discovered Woods's arrangement with Johnson.

judgment, tortious interference with prospective economic advantage, and tortious interference with contract against Komarek. On November 18, defendants timely removed, and Komarek filed an answer asserting counterclaims of breach of contract, unjust enrichment/quantum meruit, and account stated against Woods. On November 24, BMI filed an amended answer asserting counterclaims of misrepresentation/fraud, breach of contract, and breach of the covenant of good faith and fair dealing against Woods. Komarek now moves for summary judgment on Woods's claims and its counterclaim. Woods also moves for summary judgment on its breach of contract and account stated claims and BMI's counterclaims.[8]

## DISCUSSION

### I. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could

---

[8] At the hearing, Woods conceded that there is no evidence to support his claims of tortious interference with prospective economic advantage and tortious interference with contract against Komarek. Accordingly, the court dismisses those claims with prejudice.

cause a reasonable jury to return a verdict for either party. See id. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient ....").

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

**II. Breach of Contract and Account Stated Against BMI**

Woods argues that summary judgment should be granted on his breach of contract claim, or alternatively, his accounted stated claim, because it is undisputed that BMI has failed to pay him the balance of $155,988 on the Second Order without justification. BMI responds that there are genuine issues of material fact as to its affirmative defenses of fraudulent misrepresentation and equitable

estoppel, which preclude summary judgment.[9]

**A.   Fraudulent Misrepresentation**

Fraudulent misrepresentation is an affirmative defense to a breach of contract claim where the party asserting the defense establishes that:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C., 736 N.W.2d 313, 318 (Minn. 2007) (alteration in original) (quoting Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn. 1986)).

BMI argues that it relied on Woods's false claim that he stored the equipment that he ordered on its behalf. BMI points to the note section of an invoice in support of its argument. See Harris Aff. Ex. F. But the invoice referenced is not for the Second Order, which is the only order at issue in Woods's breach of contract claim. See id. The invoice for the Second Order does not mention storage, and BMI points to no evidence otherwise. See Sandstrom Aff. Ex. 6. Therefore, BMI's fraudulent

---

[9] BMI also asserts a defense of setoff/recoupment. As discussed below, Woods is liable to BMI for breach of contract. Therefore, insofar as BMI is liable to Woods, its award will be reduced accordingly.

misrepresentation defense is without merit.

**B. Equitable Estoppel**

BMI next contends that there are genuine issues of material fact as to its equitable estoppel defense. Under Minnesota law, "[e]stoppel is an equitable doctrine 'intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his strict legal rights.'" Minn. Commercial Ry. Co. v. Gen. Star Indem. Co., 408 F.3d 1061, 1063 (8th Cir. 2005) (quoting N. Petrochemical Co. v. United States Fire. Ins. Co., 277 N.W.2d 408, 410 (Minn. 1979)). In order to establish this defense, BMI must demonstrate that "[Woods] made representations or inducements, upon which [it] reasonably relied, and that [it] will be harmed if the claim of estoppel is not allowed." N. Petrochemical Co., 277 N.W.2d at 410. There is no dispute that Woods did not make any affirmative misrepresentations to BMI. Therefore, BMI must show that Woods had a duty to speak but failed to do so. Vill. of Wells v. Layne-Minn. Co., 60 N.W.2d 621, 627 (Minn. 1953); Pollard v. Southdale Gardens of Edina Condo. Ass'n, Inc., 698 N.W.2d 449, 454 (Minn. Ct. App. 2005).

BMI argues that Woods had a duty to disclose his payments to Johnson because those payments unfairly increased the price of the equipment. This omission is fraudulent only if Woods had a legal or equitable obligation to disclose it. Richfield Bank & Tr. Co. v. Sjogren, 244 N.W.2d 648, 650 (Minn. 1976). Generally, under

9

Minnesota law, "one party to a transaction has no duty to disclose material facts to the other." Id. A duty to disclose may exist, however, "in special circumstances such as: when a confidential or fiduciary relationship exists; when disclosure is necessary to clarify misleading information already disclosed; or when one party has special knowledge of material facts to which the other party does not have access." Am. Comput. Tr. Leasing v. Boerboom Int'l, Inc., 967 F.2d 1208, 1211-12 (8th Cir. 1992) (internal quotation marks omitted)(quoting L&H Airco, Inc. v. Rapistan Corp., 446 N.W.2d 372, 380 (Minn. 1989)). Under Minnesota law, "material facts are facts concerning the contract's subject matter or the parties' ability to perform." Lakeland Tool & Eng'g, Inc. v. Thermo-Serv, Inc., 916 F.2d 476, 479 (8th Cir. 1990). In other words, material facts "lie at the heart of the contract." Id.

Here, the price BMI paid Woods for the equipment is material to the contract. There is a genuine issue as to whether Woods defrauded BMI by unfairly increasing the price of the equipment. BMI points to Woods's testimony that the sole factor in determining the price charged to BMI was the amount of profit he wanted to make. But Woods also testified that the increased price was justified because he provided value to BMI beyond sourcing the equipment. Whether the price was unfairly increased as a result of the alleged kickback scheme or a legitimate markup for Woods's services is a factual issue that cannot be resolved at summary

10

judgment. Further, only Woods knew that Johnson was profiting from his relationship with Woods at BMI's expense. Based on these facts, a jury could reasonably infer that Woods defrauded BMI by failing to disclose that he and Johnson personally profited from the equipment sales. As a result, Woods is not entitled to summary judgment on his breach of contract or account stated claims.

**III. BMI's Counterclaims**

**A. Breach of Contract**

BMI asserts a breach of contract claim to recoup its advance payment on the Cancelled Order. There is no dispute that BMI made an advance payment of $75,960 to Woods pursuant to the parties' contract. See Sandstrom Ex. 7 at 6; Harris Aff. Ex. F. Although Woods asserts that he ordered the equipment from Komarek, he submits no evidence that he actually did so. Indeed, the record establishes otherwise. See Kelley Decl. Ex. 8(email from Komarek to Pierce confirming that it did not receive an order from BMI or Woods). Woods acknowledges that he owes $53,172 of the advance payment to BMI but argues that he is entitled to keep the remaining thirty percent as a cancellation fee. See Harris Aff. Ex. F; Woods Dep. at 160:20-161:3. But the contract does not include a cancellation fee provision. See Sandstrom Ex. 5. As a result, BMI is entitled to the entirety of its advance payment - $75,960.[10]

---

[10] The court finds in favor of BMI on its breach of contract claim even though it did not move for summary judgment because the facts establishing that claim are undisputed. The court,

11

**B. Unjust Enrichment**

BMI also brings a counterclaim for unjust enrichment based on Woods's payments to Johnson. To succeed on a claim for unjust enrichment BMI must show that (1) Woods received a benefit, (2) which he knowingly accepted and (3) would be inequitable for him to retain. Dahl v. R.J. Reynolds Tobacco Co., 742 N.W.2d 186, 195-96 (Minn. Ct. App. 2007). BMI argues that Woods was unjustly enriched by the several contracts he secured from BMI by means of the alleged fraudulent scheme. See Anderson v. DeLisle, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984) ("An action for unjust enrichment may be based on failure of consideration, mistake, and situations where it would be morally wrong for one party to enrich himself at the expense of another."); see also Dahl, 742 N.W.2d at 196 ("[I]t must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully.").

Woods argues that an unjust enrichment claim cannot be asserted where, as here, there is a valid contract. See Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 838 (Minn. 2012) ("[Unjust enrichment] does not apply when there is an enforceable contract that is applicable."). But "where the claims are outside the scope of the contract between the parties, unjust enrichment and quantum meruit claims are nonetheless actionable." Teng Moua

---

therefore, need not address BMI's counterclaims for misrepresentation/fraud and breach of good faith and fair dealing, which are also based on the Cancelled Order.

12

v. Jani-King of Minn., Inc., 810 F. Supp. 2d 882, 893-94 (D. Minn. 2011); see also Ventura v. Titan Sports, Inc., 65 F.3d 725, 730 (8th Cir. 1995). BMI's unjust enrichment claim is not based on the terms of a contract; rather, the claim is based on Woods's alleged self-enrichment at the expense of BMI. Therefore, the unjust enrichment claim lies outside the scope of the contract. Because, as discussed above, there is a genuine issue as to whether Woods defrauded BMI, summary judgment on the unjust enrichment counterclaim is not warranted.

**C. Fraudulent Concealment**

Woods argues that summary judgment should be granted on BMI's fraudulent concealment counterclaim because it is barred by Minnesota's economic loss doctrine, Minn. Stat. § 604.101. The court disagrees. Section 604.101 "'exhaustively states the economic loss doctrine' and thus abrogates the common law version of the doctrine." Johnson v. Bobcat Co., 175 F. Supp. 3d 1130, 1144-45 (D. Minn. 2016) (quoting Ptacek v. Earthsoils, Inc., 844 N.W.2d 535, 538-39 (Minn. Ct. App. 2014)). Section 604.101 subdiv. 4 states that "[a] buyer may not bring a common law misrepresentation claim against a seller relating to the goods sold or leased unless the misrepresentation was made intentionally or recklessly." Here, BMI's misrepresentation claim is not based on the purchased equipment, it is based on the allegedly inflated prices it paid as a result of an alleged kickback scheme. Further,

13

as already discussed, a reasonable jury could conclude that Woods intentionally defrauded BMI. As a result, BMI's claim is not barred.

Woods next argues that the fraudulent concealment claim should be dismissed because he had no duty to disclose the payments to BMI. For the reasons already discussed, this argument fails.

The court also rejects Woods's unpersuasive argument that the counterclaim should be dismissed because Johnson's knowledge of the fraud was imputed to BMI. It is well established that an agent's knowledge is not imputed to his principal when he acts for his own personal interest rather than the benefit of the principal. Sussel Co. v. First Fed. Sav. & Loan Ass'n of St. Paul, 238 N.W.2d 625, 627 (Minn. 1976). The counterclaim, however, fails on the merits.

In order to establish fraudulent concealment, BMI must demonstrate that (1) Woods engaged in a course of conduct to conceal evidence of his alleged wrongdoing and (2) BMI failed to discover the facts giving rise to [its] clam despite the exercise of due diligence. Block v. Toyota Motor Corp., 5 F. Supp. 3d 1047, 1059 (D. Minn. 2014); see also Williamson v. Prascinuas, 661 N.W.2d 645, 650 (Minn. Ct. App. 2003). The concealment "must be fraudulent or intentional and, in the absence of a fiduciary or confidential relationship, there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action." Wild v. Rariq, 234 N.W.2d 775,

795 (Minn. 1975). "[M]ere silence or failure to disclose may not in itself constitute fraudulent concealment." Id.

Even assuming that BMI exercised due diligence, there is no evidence that Woods took affirmative action to conceal his payments to Johnson. At most, Woods failed to disclose a material fact, which is insufficient to establish fraudulent concealment. As a result, the court grants summary judgment on the fraudulent concealment claim.

**D. Civil Conspiracy**

A civil conspiracy clam that is not supported by an underlying tort must be dismissed. See D.A.B. v. Brown, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) ("[A] conspiracy count fails [when] it is not supported by an underlying tort."). Because all of BMI's tort counterclaims have been dismissed, summary judgment must be granted on the civil conspiracy claim as well.[11]

**IV. Komarek's Breach of Contract Counterclaim**

Komarek argues that it is entitled to summary judgment on its breach of contract counterclaim because there is no dispute that Woods failed to fully pay Komarek for the First and Second Orders. The court agrees. Woods contends that he should be excused from payment because Komarek materially breached the parties' customary practice by shipping the equipment to BMI before he had a chance to

---

[11] BMI's remaining counterclaim of unjust enrichment is a quasi-contract claim and not a tort claim.

inspect the equipment or demand payment from BMI. Woods argues that he could have paid Komarek had he secured payment from BMI. This argument has no merit.

First, there is no evidence that Woods and Komarek had a customary practice of allowing Woods to inspect the equipment before shipment.[12] Second, even if there were sufficient evidence of this customary practice, Komarek's actions could not have prevented Woods from making payment because BMI was not obligated to pay Woods until thirty days after shipment. See Sandstrom Ex. 6 at 1; Woods Dep. at 180:5-8. Woods's reliance on BMI's payment does not excuse Woods from his obligation to pay Komarek. As a result, Komarek is entitled to summary judgment on its breach of contract claim. Further, Woods's declaratory judgment claim against Komarek is dismissed with prejudice.[13]

## V. Prejudgment Interest

Woods and Komarek dispute the rate of prejudgment interest that should accrue on the amount of money Woods owes Komarek.

---

[12] The only evidence Woods cites to is his own deposition testimony and affidavit, which are insufficient to defeat summary judgment. See Conolly v. Clark, 457 F.3d 872, 876 ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits."); see also Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.").

[13] Because the court grants summary judgment on the breach of contract claim, it need not address Komarek's alternative claims for unjust enrichment or account stated.

Komarek claims that the interest should accrue at an annual rate of ten percent pursuant to Minn. Stat. § 549.09. Woods responds that the correct interest rate is six percent per year pursuant to Minn. Stat. § 334.01. Minnesota courts have issued inconsistent decisions on how § 549.09 interacts with § 334.01. Hogenson v. Hogenson, 852 N.W.2d 266, 273 (Minn. Ct. App. 2014). In relying on Nelson v. Ill. Farmers Ins. Co., 567 N.W.2d 538 (Minn. Ct. App. 1997), the court previously held that § 549.09 applied to breach of contract actions. Best Buy Stores, L.P. v. Developers Diversified Realty Corp., 715 F. Supp. 2d 871, 877-78 (D. Minn. 2010).

Since Best Buy, however, the Minnesota Court of Appeals has clarified that § 549.09 applies only to claims for which "damages are not readily ascertainable, or when a claim did not allow for preverdict interest prior to the 1984 amendment [of § 549.09]." Hogenson, 852 N.W.2d at 273-74. In other words, the six percent rate applies to a claim only when both prejudgment interest was allowed for the claim at common law and damages are easily ascertainable. See id. at 274. (emphasis in original) ("Because preverdict interest was allowed for conversion claims under common law, preverdict interest should be calculated ... at 6% under section 334.01 ... if the damages are ascertainable or liquidated."). Because Minnesota courts have since declined to follow the reasoning in Nelson, the court's reasoning in Best Buy no longer applies. See id. at 273. ("Nothing in the plain language

17

of section 334.01 would lead us to conclude that it applies only to very specific types of claims, as suggested by this court in Nelson.").

Prejudgment interest was calculated for breach of contract claims under Minnesota common law. See Alley Constr. Co. v. Minnesota, 219 N.W.2d 922, 926-27 (Minn. 1974) (applying prejudgment interest to breach of contract action). Also, Komarek's damages are easily ascertainable. As a result, the six percent rate under § 334.01 applies.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. Defendant K.R. Komarek, Inc.'s motion for summary judgment [ECF No. 64] is granted;

2. Plaintiff's motion for summary judgment [ECF No. 67] is granted in part as set forth above;

3. Judgment shall be entered against Bobby J. Woods d/b/a Controls Plus in favor of defendant Brady-McCasland, Inc. in the amount $75,960 plus prejudgment interest of six percent per year;

4. Judgment shall be entered against Bobby J. Woods d/b/a Controls Plus in favor of defendant K.R. Komarek, Inc. in the amount of $134,299 plus prejudgment interest of six percent per year; and

5. Defendant K.R. Komarek, Inc. is dismissed from the case.

Dated: May 26, 2017

                                           s/David S. Doty
                                           David S. Doty, Judge
                                           United States District Court